UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| TRACY KELLAR, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 17-81-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, et al., | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the cross-motions for judgment filed by Plaintiff Tracy Kellar and Defendants Aetna Life Insurance Company ("Aetna") and Amazon Corporate LLC Long Term Disability Plan. [Record Nos. 21, 22] Kellar challenges Aetna's decision to deny her claim for long-term disability ("LTD") benefits under an employee benefit plan sponsored by her former employer, Amazon Corporate LLC ("Amazon"), and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* [Record No. 21] Kellar argues that Aetna's decision was arbitrary and capricious. [*Id.*] Conversely, the defendants contend that Aetna's decision was supported by substantial evidence and should be affirmed. [Record Nos. 22, 23] The defendants have the winning arguments and judgment will be entered in their favor.

**I.**

Amazon hired Kellar as a Fulfillment Associate on July 26, 2015. [Administrative Record ("AR"), p. 11] She became a participant in Amazon's group LTD plan at that time.

[*Id.*] Aetna issued the Plan to Amazon, acted as its claims administrator, and had discretion to interpret the Plan's terms and to make benefit determinations. [Plan, p. 70]

### A. Kellar's LTD Plan

The Plan pays a monthly benefit if a person covered by the Plan satisfies the LTD test of disability and the 180 day elimination period has passed. [Plan, pp. 6, 73] The LTD test of disability provides as follows:

[Y]ou will be deemed to meet the test of disability on any day that:

- You cannot perform the **material duties** of your **own occupation** solely because of an **illness, injury** or disabling pregnancy-related condition; and

- Your work earnings are 80% or less of your **adjusted predisability earnings**.

[Plan, p. 7]

"Material duties" are duties that:

- Are normally required for the performance of your own occupation; and

- Cannot be reasonably omitted or modified. However, to be **actively at work** in excess of 40 hours per week is not a material duty.

[Plan, p. 27]

Your "own occupation" is:

The work that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:

- For your specific employer; or

- At your location or work site; and

- Without regard to your specific reporting relationship.

[Plan, p. 28]

The Plan, however, "does not pay benefits for a disability that is caused, or contributed to, by a preexisting condition, if the disability starts . . . within the first 12 months after your coverage goes into effect. . . ." [Plan, p. 10] According to the Plan:

> A **preexisting condition** is an **illness, injury** or disabling pregnancy-related condition for which, during the 3 months before your coverage or any increase in your coverage became effective:
>
> - You were diagnosed or treated; or
> - You received diagnostic or treatment services; or
> - You took drugs that were prescribed or recommended by a **physician**.

[Plan, p. 9]

Fulfillment Associate is a medium exertion level position. [AR, pp. 1541-42] A Fulfillment Associate at Amazon must be able to lift up to 49 pounds with or without reasonable accommodation; stand/walk for 10-12 hours; frequently push, pull, squat, bend, and reach; continuously climb and descend stairs; and work on powered equipment such as a forklift or cherry picker. [AR, pp. 1545-46]

  B. **Kellar's LTD Claim**

Kellar was injured on August 25, 2015, one month after she began working for Amazon, when she was struck in the shins by a flatbed cart being pushed by another associate. [AR, pp. 1497-1502] Both shins appeared to be bruised, an abrasion on her left shin was bleeding, and she initially reported a pain level of 8 out of 10. [AR, pp. 1497-99] Kellar was treated onsite for the injury with ice. [AR, pp. 1498-1500] She reported a discomfort level later that day of 0 out of 10, and returned to work. [AR, p. 1501]

Kellar went to the emergency room the following week, stating that she sustained injuries to her shins and simply wanted to "have them checked." [AR, p. 1016] Kellar also

stated that she had a friend who required a skin graft to cover a skin defect from an injury to her shin some time ago, and she was concerned that she may also require a skin graft. [*Id.*] Dr. Robert Matheny examined Kellar and found that both shins were bruised and the left shin had "a small, approximately 1 x 1 cm, cutaneous defect where there was a skin tear." [*Id.*] He stated that there was "good granulation tissue in the bottom of this, and it appear[ed] to be healing well." [*Id.*] He also found "no evidence [of] infection." [*Id.*] Dr. Matheny recommended that Kellar continue with simple conservative care, supplied her with Ace bandages, and stated that a "support hose may be of some utility when she returns to work." [*Id.*]

Kellar continued working until September 7, 2015. [AR, p. 11] She reported left leg pain to her primary care physician, Dr. Daniel Beiting, the following day. [AR, pp. 1035-38] Kellar also stated that she fell on her elbow after being hit by the cart and wanted it x-rayed. [*Id.*] Dr. Beiting ordered x-rays of her leg and elbow and prescribed antibiotics in case she had some superficial cellulitis. [AR, p. 1038] He also gave her a work excuse through September 9, 2015. [*Id.*] The x-ray of Kellar's elbow was normal, and the x-ray of her left leg revealed anterior soft tissue swelling. [AR, p. 1039]

Kellar saw Dr. Richard Ramirez at Concentra Medical Centers on September 10, 2015. [AR, pp. 1551-53] She reported constantly experiencing sharp, moderately severe pain, and stated that her current pain level was 5 out of 10. [AR, p. 1551] Ramierz did not have medical records to review from Kellar's treatment at the emergency room and by her primary care physician, and he stated that Kellar "was not willing to provide them." [AR, pp. 1551, 1553] However, Dr. Ramirez stated that Kellar had a note from her primary care physician indicating that she was to be out of work. [AR, p. 1553] He found a 2 x 1.5 cm

superficial ulceration on the right leg and on the left leg and a swollen tender area on the left leg. [AR, p. 1552] He ordered an ultrasound of the left lower leg. [*Id.*]

Kellar followed up at Concentra on September 14, 2015, and saw Sheila Thornsberry, PA-C, instead of Dr. Ramirez. [AR, pp. 1554-57] Like Ramirez, Thornsberry was not provided with any notes from Kellar's visits to the emergency room or her primary care physician. [AR, p. 1556] Kellar described her pain as aching in nature and reported a current pain level of 8 out of 10. [AR, p. 1554] She also stated that she had to stop using her prescribed antibiotics due to gastrointestinal upset. [*Id.*] Thornsberry found a bilateral abrasion with no sign of infection and hematoma of both legs. [AR, p. 1555] Kellar apparently requested a referral to a plastic surgeon or wound care specialist, but Thornsberry disagreed and referred her to an orthopedic specialist instead. [Record No. 21-1, p. 6; AR, p. 1555] Further, Kellar stated that she "want[ed] to be off work completely," but Thornsberry explained that "she should be able to work with restrictions to rotate sitting and standing as long as she elevated her legs while sitting." [AR, p. 1556]

Kellar saw Dr. Saroj B. Dubal at Advanced Pain Medicine on September 16, 2015. [AR, pp. 938-41] Kellar had been seeing Dubal since 2011 for pain management services regarding injuries she sustained in a 2010 motor vehicle accident. [*See* Record No. 23, p. 4; Record No. 21-1, p. 6; Record No. 26, pp. 1-2] Treatment notes from that visit state that "[s]ince last visit [Kellar] was hit by a cart at work on both lower extremities. There is a questionable infection in the area." [AR, p. 941] However, Kellar also saw dermatologist Dr. Jonathan Keeling that day for a "full skin exam." [AR, p. 1112] Kellar reported specific concerns with spots on her face, but did not mention any issue with her shins, and Keeling indicated that her right and left lower extremities were normal. [AR, pp. 1112, 1114]

Kellar was examined by Dr. Wallace Huff, an orthopedic surgeon, on September 17, 2015, pursuant to her referral from Concentra. [AR, pp. 1597-98] Huff found no acute skin injuries, no erythema, and no other signs of infection. [AR, p. 1598] He recommended heat alternated with ice and kept Kellar off work for elevation and swelling control until she could be seen for a follow-up. [AR, p. 1599] At a follow-up on October 5, 2015, Huff noted that Kellar had "a lot of burning pain[;] difficult[y] sleeping at night[;] she also has trouble with walking standing and persistent swelling and at this time is somewhat depressed over her aggravation at having to deal with this injury." [AR, p. 1600] He recommended continued use of oral antibiotics and daily cleansing with soap and water and Neosporin ointment, and Neurontin for nighttime sleeping and help with the alleged pain. [AR, p. 1601]

Dr. Huff saw Kellar again on October 29, 2015. [AR, pp. 1603-05] He stated that she "appeared to have partial-thickness skin loss which was healing secondarily[,] but comes in today with full thickness skin loss on the left side with some surrounding cellulitis which has developed over the last 24-48 hours." [AR, p. 1603] His assessment was that the wounds "failed to heal by conservative measures and now appear to show full-thickness skin loss with some throbbing cellulitis on the left side consistent with superficial infection." [AR, p. 1604] Huff referred Kellar to Dr. Michael J. Bass, a plastic surgeon, for an evaluation for skin grafting. [*Id.*] Kellar saw Dr. Bass the next day, and underwent a debridement with plastic surgery on November 2, 2016, leaving open wounds to heal. [AR, pp. 1624-31]

Dr. Bass completed an Attending Provider Statement on February 19, 2016, indicating that Kellar could not walk or stand for more 15 minutes without pain as a result of her open wounds. [AR, p. 1488] Bass also completed a Capabilities and Limitations

Worksheet, indicating that Kellar could not crawl, climb, kneel, lift, pull, push, or carry. [AR, p. 1490] He stated that she could not lift more than 10 pounds, and that she could not work more than 2 hours per day. [*Id.*] However, Dr. Bass indicated that Kellar should be able to return to work by October 1, 2016. [AR, p. 1488] In Kellar's next visit on February 25, 2016, Bass noted that the wound on the right leg was closed and that the wound on the left leg measured 1.9 x 1.4 cm. [AR, p. 1610] He stated that the wound was "[a]lmost healed" on March 1, 2016. [AR, p. 1609] On March 8, 2016, he found that the wound on the right leg had epithelialized, and that the wound on the left leg was "almost covered." [AR, p. 1608] Dr. Bass stated in his final visit with Kellar on March 24, 2016, that both wounds had epithelialized. [AR, p. 1607]

Kellar also saw dermatologist Dr. Jonathan Keeling, on March 24, 2016. [AR, p. 1108] Kellar stated that she did not feel she had received proper care, and reported that a culture was done in October that showed a staph infection and that she was never given antibiotics for the infection.[1] [*Id.*] Keeling noted scars on both of Kellar's shins from the original trauma and the surgical procedure, but described both scars as "healed, no open areas" and "well healed." [AR, pp. 1110-11] He noted questionable mild cellulitis in the surrounding areas, but believed this was just post-inflammatory erythema, and prescribed an antibiotic and a topical ointment. [AR, p. 1111]

Kellar filed an LTD claim with Aetna for an absence from work beginning on September 10, 2015. As a result of the 180 day elimination period, Kellar was eligible for

---

[1] Kellar's statement that she was never given antibiotics is inconsistent with the medical records from Beiting, Thornsberry, and Huff, which indicate that she was in fact prescribed antibiotics. [AR, 1037, 1554, 1601]

benefits if she satisfied the test of disability after March 8, 2016. [Plan, pp. 6, 73; AR, p. 206] Further, because the claimed disability began within 12 months of the effective date of her coverage, Aetna was required to conduct a preexisting condition review for the 3 month "look-back period" between April 26, 2015 and July 25, 2015. [Plan, pp. 9-10; AR, p. 13]

Nurse Holly Sheplar reviewed Kellar's file for Aetna. [AR, pp. 69-74] As part of the preexisting condition review, Sheplar noted that Kellar was diagnosed, treated, received diagnostic services, or took drugs that were prescribed or recommended by a physician for the following medical conditions and diagnoses within the 3 month look-back period:

> Neck pain, thoracic pain, lumbar pain, sacral pain, right hip pain, right thigh pain, unsteadiness, loss of balance, gait problems, weakness, dizziness, hearing loss, migraine headache, tension headache, stress headache, nausea, vomiting, decreased sexual drive, joint pain and joint stiffness, joint swelling, difficulty remembering, difficulty walking, difficulty with balance, falling down, numbness, anxiety, depression, difficulty sleeping, insomnia, increased appetite, excessive fatigue, hypertension, myofascitis, chronic pain due to trauma, genital herpes, hormone replacement therapy, smoking cessation treatment, vitamin D deficiency, osteoarthritis, cervical pain with radicular features with pain radiating to the posterior neck, suboccipital region, trapezius and bilateral shoulder blades, then down bilateral arms with associated aching and tingling. Antalgic gait. Cervical spondylosis, cervicocranial syndrome, lumbosacral spondylosis, displacement of lumbar intervertebral disc, degeneration of lumbar or lumbosacral disc, suprascapular neuralgia (bilateral), occipital neuralgia, lumbar radiculopathy, whiplash, upper respiratory infection, asthma, cough, sputum production, hoarseness, generalized abdominal pain, left lower quadrant abdominal pain, abnormal pap smear of the cervix, allergic rhinitis, bloating with gas pain, bronchitis, diverticulosis, edema, influenza, back pain, shoulder joint pain, acute pharyngitis, varicose veins, seasonal allergies, head congestion, bradycardia.

[AR, p. 73]

Sheplar then found that there was a lack of medical evidence for impairment to general activity or specific tasks as of March 8, 2016. [AR, p. 73] Although she acknowledged the injury to Kellar's shins and her subsequent treatment, including

debridement with plastic surgery, Sheplar concluded that the wound care prescribed would not have limited Kellar's physical activity. [*Id.*] She explained:

> The submitted documentation reports ongoing wound care of a superficial skin defect. Though the wound is documented to be 13mm, it is superficial with granulating tissue. The type of wound care prescribed would not limit any physical activity on its own. The standing and activity restriction provided by plastic surgery appear to be based on your reported intolerance of those activities. There is no lower extremity range of motion, strength, sensory, or proprioception deficits are identified. There is no sitting, standing, or walking intolerance that is documented or observed. There are no gait or station abnormalities documented or observed.

[*Id.*]

Aetna denied Kellar's LTD claim on May 24, 2016, based on Sheplar's review. [AR, pp. 205-08] Kellar was referred to a neurologist, Dr. Alexander Landfield, after her LTD claim was denied. Dr. Landfield noted that Kellar's skin was well-healed, but there were scars from her surgery, edema in her lower legs and ankle, and hyperesthesia over both shins. [AR, p. 1822] He diagnosed complex regional pain syndrome, type 1, bilateral lower extremities (CRPS/RSD) and causalgia bilateral lower extremities, and noted that "[t]his appears to have come on after the injury." [*Id.*] Landfield completed a Residual Functional Capacity form on August 29, 2016, reiterating his CRPS finding and stating that Kellar: (i) could not stand for more than 2 hours; (ii) could not sit upright for six to eight hours; (iii) could not lift and carry more than 11 to 20 pounds regularly or during an eight-hour period; (iv) was impaired in standing, bending, and stooping; (v) and had difficulty bending, squatting, and kneeling. [AR, pp. 1827-30] Kellar reported frequent sharp and shooting pain at a level 7-10. [AR, p. 1830] Dr. Landfield stated that Kellar's appeared to be credible with regard to her claims of pain and that the CRPS provided an objective medical reason for the

pain. [AR, p. 1831] He also indicated that Kellar was "probably unlikely to be able to return to [her] prior position." [*Id.*]

Kellar obtained an independent medical evaluation from a family practice physician, Dr. Gregory T. Snider, on July 22, 2016. [AR, pp. 774-490] Dr. Snider reviewed the records from Beiting, Concentra, Huff, Bass, and Landfield, but was unable to review Kellar's pre-injury records, the notes from her visit to the emergency room, or her onsite treatment. [AR, p. 778] After examining Kellar, Snider found that the plaintiff "has suffered a substantial soft tissue injury to her lower extremities. It appears that she has developed CRPS/RSD. . . . I do not see any preexisting condition that would have predictably contributed to, or caused, Ms. Kellar's current condition. This all appears to be related to the blow her shins." [*Id.*] Dr. Snider stated that "Ms. Kellar could return to work, but would require accommodation. I recommend largely sit-down work with minimal standing and walking, no ladder climbing, no kneeling or squatting. I am hopeful that, with successful treatment, Ms. Kellar will not require any substantial permanent work restrictions." [*Id.*]

Kellar obtained a Functional Capacity Evaluation from physical therapist Robert McCray, on September 23, 2016. [AR, pp. 781-89] McCray noted significant limitations in lifting, carrying, walking, and prolonged positioning. [AR, p. 782] He then reviewed the physical demands listed in the job description for a Fulfillment Associate at Amazon. Kellar told McCray that, before being hired at Amazon, she had reported that she had back issues from a prior injury that limited her in sitting and the amount she could lift, but she did not report any problems doing the job up to the time of the injury. [*Id.*] McCray concluded that:

> Since no physical demand testing was done at the time of hire, there is no way to compare her current abilities with those at the time of her hire to determine any changes in her abilities. The only comparison available is that she was

-10-

> apparently performing the job duties successfully up to the time of her injury. Comparing her physical performance today to the demands listed indicate she is not capable of meeting the physical demands of the position or returning to this position at this time.

[*Id.*]

Kellar appealed Aetna's denial of her LTD claim on October 10, 2016. [AR, p. 793-98] She argued that she was disabled due to her bilateral shin injuries, CRPS, depression, and other conditions. [AR, p. 795] Kellar relied principally on Bass' Attending Physician Statement from February 19, 2016, Landfield's notes and Residual Functional Capacity form, and McCray's Functional Capacity Evaluation. [AR, pp. 795-97] Aetna referred the matter to Dr. Charles Cooper for an independent physician review. [AR, pp. 438-46]

Cooper noted that Kellar was treated for depression and related conditions by several different doctors on February 19, 2015, March 2, 2015, March 10, 2015, December 7, 2015, and June 8, 2016. [AR, p. 443] As a result, Dr. Cooper found that Kellar's "psychiatric disturbances predated the work-related injury." [*Id.*] Second, Cooper found that Landfield's CRPS diagnosis was "internal[ly] inconsistent and [did] not make clinical sense with claimant" because Landfield referred to both CRPS type 1 *and* causalgia, which is CRPS type 2 and only applies when an identifiable nerve lesion exists, which is not the case with Kellar. [AR, p. 444] Further, he explained that because "the syndrome is *regional* in nature, having the syndrome in both lower extremities (as with claimant) and to a substantially similar degree, would be highly unusual." [*Id.*]

Instead, Dr. Cooper stated that "[i]t is my opinion that claimant has chronic pain of unclear etiology and had chronic pain of unclear etiology prior to her work-related injury." [*Id.*] In support, Dr. Cooper noted that, since 2011, Kellar had been seeing Dr. Saroj B.

Dubal at Advanced Pain Management for injuries she sustained in a motor vehicle accident. [*See* Record No. 23, p. 4; Record No. 21-1, p. 6; Record No. 26, pp. 1-2] Kellar reported the following functional limitations to Dubal on March 12, 2015, March 19, 2015, April 2, 2015, April 23, 2015, May 19, 2015, and June 24, 2015:

> Lifting. I can lift only very light weights.
> Walking. Pain prevents me from walking more than 10 minutes.
> Sitting. Pain prevents me from sitting more than ½ hour.
> Standing. Pain prevents me from standing for more than 1 hour.
> Social life. Pain has restricted my social life and I do not go out very often.
> Traveling. Pain restricts me to journeys of less than one hour.

[AR, pp. 904, 908, 913, 917, 922, 927]

Kellar also saw neurologist Dr. Alexander Tikhtman regarding complaints of headaches, low back pain, and poor balance on March 10, 2015. [AR, p. 1340] Dr. Tikhtman noted that Kellar was "applying for disability." [*Id.*] Cooper found this comment odd because "the physical examination was unremarkable (except for decreased range-of-motion in the neck) including a '[n]ormal gait, stance, and balance.'" [AR, p. 443] Kellar also saw her primary care physician Dr. Beiting on April 2, 2015, May 22, 2015, and May 27, 2015. [AR, pp. 1169-78] Beiting noted that Kellar had begun working for Amazon through a staffing agency, but did not indicate any impairment, restriction, or limitation in any of his treatment notes. [*Id.*] Dr. Cooper stated that the physical examinations from these visits were unremarkable, and "there [was] no indication of impairments with walking, sitting, lifting, and standing which is inconsistent with the notes from Advanced Pain Medicine aforementioned." [AR, p. 443]

Moreover, Dr. Cooper found that the functional limitations Kellar reported to Advanced Pain Management were nearly identical to the functional limitations reported to Bass, Landfield, and McCray. [*See* AR, pp. 442-43] He explained:

> If I ignore the diagnostic labels from 2015 and 2016 and only look at the alleged functional limitations, it is difficult to see differences. Claimant's practitioners state that she cannot walk, stand, lift, etc. whether on 22 Jul 2015 (before she worked at Amazon) or on 19 Feb 2016 (after she worked and was injured at Amazon). The diagnostic labels change, but the alleged functional outcomes do not.
>
> Having looked at the job description for claimant and the notes from Advanced Pain Medicine from 22 Jan 2015 to 22 Jul 2015, I cannot see how claimant would be able to function whether with or without accommodation, assuming the limitations and restrictions enumerated by MD Dubal were accurate. In essence, it is highly inconsistent that claimant had a period of 'non-pain' that began around 25 Jul 2015 and ended in Sep 2015 coinciding with her work at Amazon.

[AR, p. 443]

Finally, Cooper found that, "although claimant had temporary impairments (e.g. open wounds for the post-operative period) that either limited or restricted her, these temporary impairments have resolved or are no longer relevant." [AR, p. 444] He stated that the record was "unclear as to what on-going impairments, functional or otherwise, are present in Ms. Tracy Kellar. Most documentation is subjective in nature and regards pain, the perception of pain, or somatic symptoms all without documented functional deficit (both prior to the work-related injury and after the injury)." [*Id.*] Although he believed that Kellar's inactivity may have resulted in deconditioning, he believed that she could constantly push, pull, walk, sit, and reach; frequently climb stairs, bend, crawl, kneel, stand, and carry up to twenty pounds; and occasionally stoop, climb ladders, and carry up to fifty pounds. [AR, pp. 444-45]

Aetna affirmed its decision to deny Kellar's claim for LTD benefits on November 18, 2016, based on the reviews conducted by Sheplar and Cooper. [AR, p. 229-33] Kellar filed this action on January 30, 2017, arguing that Aetna's decision was arbitrary and capricious under the ERISA. [*See* Record No. 1, Exhibit A.]

## II.

The ERISA does not specify a judicial standard of review. Generally, a challenge under the ERISA is reviewed *de novo*. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). However, if the plan at issue grants the plan administrator the discretion to determine benefit eligibility, the Court will uphold the plan administrator's determination unless it is arbitrary or capricious. *Id.* Here, the parties do not dispute that the Plan grants such discretion to Aetna. Likewise, the parties have stipulated that the Court should apply the arbitrary and capricious standard in reviewing Aetna's decision. [Record No. 20]

The arbitrary and capricious standard is the "least demanding form of judicial review." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011) (internal quotation marks omitted). When it is possible to offer a reasoned explanation, based on substantial evidence, for a particular outcome, that outcome is not arbitrary or capricious. *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006). Substantial evidence is evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). This standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (citations and

internal quotation marks omitted). The administrator's decision must be affirmed if supported by substantial evidence, even if the Court would decide the case differently and even if the plaintiff's position is also supported by substantial evidence. *See Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 555 (6th Cir. 1995); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989).

And while the arbitrary and capricious standard is highly deferential, it "does not require [the Court] merely to rubber stamp the administrator's decision." *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). Rather, the Court reviews "the quality and quantity of the medical evidence on both sides of the issue" to determine whether the administrator's decision was arbitrary and capricious. *Id.* (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

**III.**

Kellar argues that Aetna's decision was arbitrary and capricious, in part, because Aetna acted under a conflict of interest. [Record No. 21-1, p. 12-13] When a plan, like the one in this case, "authorizes an administrator both to decide whether an employee is eligible for benefits and to pay those benefits, it creates an apparent conflict of interest." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (internal quotation marks and citation omitted). The Court must consider this conflict as a factor when determining

whether the plan administrator's decision was arbitrary or capricious. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292-93 (6th Cir. 2006). "However, the standard of review is not altered to a less deferential standard when the benefits administrator is operating under a conflict of interest." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006). Instead, "the standard remains unchanged and the conflict of interest is to be considered in *applying* that standard.'" *Id.* (quoting *Calvert*, 409 F.3d at 292) (emphasis in original).

In evaluating a conflict of interest, "the reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision," *Evans*, 434 F.3d at 876, and weighs the conflict of interest more heavily "where circumstances suggest a higher likelihood that it affected the benefits decision." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). For the Court to give great weight to a conflict of interest, "there must be significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present." *Smith*, 450 F.3d at 260. Kellar has failed to provide any evidence to support a conclusion that Aetna's conflict of interest actually motivated its denial of benefits. The mere existence of a structural conflict of interest does not render Aetna's decision arbitrary and capricious. Accordingly, the Court does not give great weight to this factor.

**IV.**

Kellar also argues that Aetna's decision was arbitrary and capricious because the medical evidence would support a finding that she is disabled due to her workplace injury, and Aetna relied on file reviews, one of which was conducted by a nurse, in determining that she is not disabled. [Record No. 21-1, p. 4-12, 14-16] The Supreme Court and the United States Court of Appeals for the Sixth Circuit have established "certain guideposts" to follow

when reviewing benefit determinations under the ERISA. *Evans v. Unum Provident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006). First, in the ERISA context "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). As a result, it is generally not arbitrary and capricious for a plan administrator to choose to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, because when an administrator does so it is "possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald*, 347 F.3d at 169.

Second, the Sixth Circuit has stated that there is "nothing inherently objectionable about a file review . . . in the context of a benefits determination." *Calvert*, 409 F.3d at 296. This is true whether the review is conducted by a nurse or a physician. *See Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 663 (6th Cir. 2013) (citing *Boone v. Liberty Life Assurance Co. of Boston*, 161 F. App'x 469, 474 (6th Cir. 2005)). However, the Sixth Circuit has concluded that a file review may be inadequate when: (i) the file reviewer concludes that the claimant is not credible without having actually examined him or her, (ii) the file reviewer fails to provide a rational basis for his or her conclusions or to rebut contrary evidence in the claimant's medical records, or (iii) the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician. *Id.* (citations omitted); *see also Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 605-06 (citing *Smith*, 450 F.3d at 263).

There is evidence that would support a finding that Kellar is disabled due her workplace injury. The statements provided by Bass, Landfield, McCray, and Snider, indicate that Kellar has functional limitations that would prevent her from performing her work at Amazon, and that the limitations may have resulted from the blow to her shins. [AR, pp. 1488-90; 1827-30; 781-89; 774-490] However, Sheplar and Cooper provided specific reasons in their file reviews for rejecting this conclusion. Sheplar explained that the standing and activity restrictions contained in Bass' Attending Provider Statement "appear[ed] to be based on [Kellar's] reported intolerance of those activities," and were inconsistent with the objective medical evidence. [AR, p. 73] Kellar reported these same limitations to Dubal on several occasions prior to beginning work at Amazon and sustaining the injury to her shins. [AR, pp. 904, 908, 913, 917, 922, 927]

It appears that McCray did not have these records available for his review, as he stated that "there [was] no way to compare [Kellar's] current abilities with those at the time of her hire to determine any changes in her abilities," despite the fact that that Kellar had reported her functional limitations to Dubal a mere two days before being hired by Amazon. [AR, pp. 782, 927] And Snider specifically stated that he was unable to review Kellar's preinjury records or the records from her onsite treatment and emergency room visit. [AR, p. 778] Further, Cooper found that Landfield's diagnosis that Kellar had both type 1 and type 2 CRPS was "internal[ly] inconsistent and [did] not make clinical sense with claimant," given that CRPS is regional in nature and "having the syndrome in both lower extremities (as with claimant) and to a substantially similar degree, would be highly unusual." [AR, p. 444]

These reasons do not rely on improper credibility findings. It is permissible for a file reviewer to make findings that "simply echo those of [the claimant's] own doctors, make

note where the reports lack objective medical evidence in support of the boxes checked, and point out the internal inconsistencies." *Judge*, 710 F.3d at 663. Sheplar and Cooper simply pointed out that Kellar's reports of her functional limitations were inconsistent with the objective medical evidence regarding her shin injuries and recovery, and noted inconsistencies in the records Kellar sought to rely on. [AR, pp. 73, 441-45] Based on a full review of Kellar's medical records, Cooper found that her reported limitations were "not consistent with [the] mechanism of injury nor [were] they consistent with the complications from treatment for the injury (e.g. skin grafting) or concomitant comorbid illness in claimant (e.g. migraine headaches)." [AR, p. 441] Instead, he concluded that the most persuasive explanation of her reported limitations was that she "has had chronic pain of unclear etiology for many years," pre-dating her injury at Amazon. [AR, pp. 444-45] This conclusion was supported by the limitations Kellar reported over a lengthy time period, and the records from her own doctors. [AR, pp. 904, 908, 913, 917, 922, 927]

Aetna fully explained its reasons for adopting the file reviewer's findings in its decision denying Kellar's appeal, stating, in relevant part:

> [W]e find that Ms. Kellar suffered from a work related injury, that caused contusion to her lower extremities in August 2015. This injury reasonably caused her pain and discomfort. However, prior to her most recent injury, she was being treated for chronic pain. Although she was recently diagnosed with CRPS, there has been no evaluation of her prior condition in relation to her new diagnosis. In addition, due to her recent injury, from August 2015, our review has found that she currently has the functional capacity to perform the material duties of her own occupation. Although we understand that Ms. Kellar has frequent and consistent complaints of pain, her complaints have not changed since prior to her effective date of coverage (i.e. difficulty with ambulation, pain in her neck, shoulders, and lower back that radiates to her lower extremities). Therefore, the original decision to deny LTD benefits, effective March 8, 2016, has been upheld on appeal.

[*Id.*]

This decision is not arbitrary and capricious. Aetna was entitled to credit the opinions stated by Sheplar and Cooper over those expressed by Bass, Landfield, McCray, and Snider, and it satisfied its obligation to provide a reasoned explanation for doing so. *McDonald*, 347 F.3d at 169. Aetna's decision was "the result of a deliberate, principled reasoning process and supported by substantial evidence." *Judge*, 710 F.3d at 664 (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991) (internal quotation marks omitted)). Although there is evidence in the record that would have supported a contrary finding, the Court should not second guess an administrator's decision when it is supported by substantial evidence. *See Wages v. Sandler, O'Neill and Partners, L.P.*, 37 F. App'x 108, 112-13 (6th Cir. 2002). Accordingly, Aetna's decision to deny Kellar's claim for LTD benefits will be affirmed.

V.

For the foregoing reasons, it is hereby

**ORDERED** as follows:

1.  Plaintiff Tracy Kellar's motion for judgment [Record No. 21] is **DENIED**.

2.  The defendants' motion for judgment [Record No. 22] is **GRANTED**.

3.  The defendants' decision regarding Plaintiff Tracy Kellar's claim for long-term disability benefits will be **AFFIRMED** by separate judgment entered this date.

This 5th day of February, 2018.



Signed By:
*Danny C. Reeves*  DCR
United States District Judge